FILED

2014 Mar-04 PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| **LARRY CALHOUN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:11-CV-4134-VEH** |
| | ) | |
| **JOHN M. McHUGH, Secretary,** | ) | |
| **Department of the Army,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

The defendant (Secretary McHugh) has filed simultaneous motions to dismiss and for summary judgment. Doc. 26. The plaintiff (Mr. Calhoun) has responded, doc. 30, and Secretary McHugh has replied, doc. 44. Mr. Calhoun has also moved to strike some of the Secretary's submitted evidence. Doc. 29. For the following reasons, the court will:

- treat Secretary McHugh's motion as one for summary judgment;

- treat Mr. Calhoun's Motion to Strike as an objection under Federal Rule of Civil Procedure 56(c)(2);

- **GRANT in part and DENY in part** Mr. Calhoun's objection; and

- **GRANT in part and DENY in part** the Secretary's motion.

As described below, the court will grant Secretary McHugh summary judgment as to Mr. Calhoun's sexual harassment claim but will deny him such judgment as to Mr. Calhoun's racial discrimination and retaliation claims.

PRELIMINARY MATTERS

## I.     Motion to Dismiss vs. Motion for Summary Judgment

Before the court may assess the motion, it must first decide whether to treat the Secretary's motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or as a motion for summary judgment under Rule 56(a). *Compare* Fed. R. Civ. 12(b)(6) *with* Fed. R. Civ. P. 56(a). When considering a Rule 12(b)(6) Motion, a district court is generally "constrained to review the allegations as contained within the four corners of the complaint." *Crowell v. Morgan, Stanley, Dean Witter Servs. Co., Inc.*, 87 F. Supp. 2d 1287, 1290 (S.D. Fla. 2000) (citations omitted). However, a court may consider documents attached to such a motion if they are (1) referred to in the complaint and are (2) central to the plaintiff's claim. *Starship Enters. of Atlanta, Inc. v. Coweta County, Ga.*, 708 F.3d 1243, 1252 n.13 (11th Cir. 2013) (citation omitted). "When the court considers matters outside the pleadings, however, the Rule 12(b)(6) motion converts into a Rule 56 motion for summary judgment." *Id.* (citation omitted).

Secretary McHugh attached twelve exhibits to his motion and later

2

supplemented these with four more submissions. *See* Docs. 28, 43. These exhibits

include depositions, hearing transcripts, administrative transcripts, and personal

declarations. The plaintiff does not mention any of these documents in his Complaint.

The court will consider the Secretary's attached documents and thus treat his motion

as one for summary judgment under Rule 56(a).

## II.   Motion to Strike

This conclusion segues into another antecedent issue – which extrinsic

evidence to consider in examining the Secretary's motion. Mr. Calhoun seeks to

strike three of the motion's evidentiary submissions. Specifically, he asks this court

to remove the following from its consideration:

- Defendant's Exhibit 7;

- Defendant's Exhibit 8; and

- Paragraph 13 in the "Statement of Undisputed Material Facts" section of Defendant's memorandum accompanying its motion.

Doc. 29 at 1 (citing Docs. 28-7, 28-8, 27 at 6).[1] Rule 56(c)(2) allows a party to object

to any material filed by another party on summary judgment on the basis that such

material "cannot be presented in a form that would be admissible in evidence." Fed.

---

[1]All citations to the record in this opinion employ the numbering system dictated by the Case Management/Electronic Case Files (CM/ECF) system, *not* that necessarily used by the parties in their various submissions.

R. Civ. P. 56(c)(2). Although Mr. Calhoun characterizes his filing as a Motion to Strike, the motion challenges the admissibility of the above-cited evidence. The court will thus treat his motion as an objection under Rule 56(c)(2). And, for the following reasons, the court will **GRANT in part and DENY in part** his objection.

### A.     *Exhibit 7*

Exhibit 7 is a declaration made by Charles Barclay, a representative with the local AFGE union at the Anniston Army Depot during the events at issue. Doc. 28-7 at 1-3. He allegedly made the statement to an Equal Employment Opportunity Commission (EEOC) investigator. *Id.* at 1. Mr. Calhoun complains that the declaration fails under Rule 56. Doc. 29 ¶¶ 2-6. This rule requires that such declarations:

- be made on personal knowledge;

- set out admissible facts; and

- show that the declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(4).[2] Mr. Calhoun notes that Barclay's declaration does not affirm that he is competent to testify or that he has direct knowledge of the asserted

---

[2]Mr. Calhoun cites Rule 56(e)(1) of an older version of the Rules in support of this claim. Congress partially revised this rule in 2010. The cited provision can now – in relevant substance – be located at Rule 56(c)(4). *See* Fed. R. Civ. P. 56, Advisory Committee Note, 2010 Amendments ("Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1).").

contents. *Id.* ¶¶ 3-4. Mr. Calhoun also observes that the declaration is both unsigned and undated – and thus cannot be authenticated. *Id.* ¶ 5. He finally claims that the document is impermissible hearsay. *Id.* ¶ 6.

In response, Secretary McHugh submits a supplemental exhibit containing a signed and dated version of the declaration affirming that Barclay can competently testify and has direct knowledge of what he declares. Doc. 45-4. The Secretary further argues that this court may still consider the declaration – even if hearsay – because it is reducible to an admissible form at trial. Doc. 40 at 2-3. That is, Mr. Barclay could testify at trial to the statements he made to the EEOC investigator, thus eliminating any hearsay problems. *Id.* at 3.

Although Secretary McHugh phrases his argument indelicately, the court finds it persuasive. Generally, a district court may not consider inadmissible hearsay on a motion for summary judgment. *Macuba v. DeBoer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation and footnote omitted). An exception to this rule applies, however, if the hearsay "could be reduced to admissible evidence at trial" or "reduced to admissible form." *Id.* at 1323 (citations omitted). That is, it "must be admissible at trial for some purpose." *Id.* Federal Rule of Evidence 801 defines "hearsay" as any statement that (1) the declarant (i.e., the person who made the statement) does not make while testifying at the current trial or hearing; and that (2) a party offers in

evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(b)-(c). Hearsay is not admissible at trial unless allowed by:

- •   a federal statute;

- •   the Federal Rules of Evidence; or

- •   other rules prescribed by the Supreme Court.

*Id.* 802.

Secretary McHugh correctly notes that he could "reduce" the declaration to admissible evidence at trial by having Mr. Barclay testify. Doc. 40 at 3. Such testimony would not be hearsay. The court will therefore consider Mr. Barclay's declaration.

### B.   *Exhibit 8*

Exhibit 8 is the EEOC Investigator's "Report of Investigation" (ROI). Doc. 28-8. Mr. Calhoun complains that this document also doesn't comply with Rule 56 because the author has not affirmed that he has direct knowledge of its contents. Doc. 29 ¶ 9. Mr. Calhoun also claims that the document (1) contains inadmissible hearsay and (2) states an inadmissible legal conclusion that invades this court's authority. *Id.* ¶¶ 10-11. Secretary McHugh responsively argues that the ROI would be admissible at trial under the "public records exception" to the hearsay rule. Doc. 40 at 3-4 (citing Fed. R. Ev. 803(8)).

The Secretary is at least partially correct.  Under Rule 803(8), a public office's record or statement – although hearsay – is nevertheless admissible at trial if it sets out factual findings from a legally-authorized investigation in a civil case. Fed. R. Evid. 803(8)(A)(iii).[3] This provision applies here. Every federal agency must conduct an impartial and appropriate investigation within 180 days after a party files an EEO discrimination complaint. 29 C.F.R. § 1614.106(e)(2). The EEOC – on behalf of the Army – did so here, and its product was the ROI. Because the ROI therefore contains factual findings from a legally-authorized investigation, it "could be reduced to admissible evidence at trial" under Rule 803(8).

However, the report also contains the investigator's analytical conclusions. *E.g.*, Doc. 28-8 at 7. Mr. Calhoun objects that these judgments are improperly legal. Doc. 29 ¶ 11. As a general matter, "this circuit considers EEOC determinations to be highly probative," and "administrative findings assessing claims of employment discrimination are admissible under [Rule] 803(8)(C)."[4] *Barfield v. Orange County*, 911 F.2d 644, 650 (11th Cir. 1990) (citations omitted). That being said, "there may

---

[3]There is also a requirement that the document be trustworthy. Fed. R. Evid. 803(8)(B). Mr. Calhoun does not dispute the ROI's trustworthiness.

[4]The cited provision can now be found at Fed. R. Evid. 803(8)(A). *See* Fed. R. Evid. 803, Advisory Committee Notes, 2011 Amendments ("The language of Rule 803 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules.").

be circumstances in which that probative value [of such evidence] . . . nevertheless is outweighed by the danger of creating unfair prejudice in the minds of a jury." *Id.* (citation omitted). Accordingly, in determining "whether and what parts of EEOC determinations and reports should be admitted," a district court may consider whether the reports:

- contain legal conclusions in addition to factual content;

- raise questions of trustworthiness under Rule 803(8)(B); or

- present Rule 403 problems.

*Id.* (internal citations omitted). On the first point, Rule 803(8)(A) "does not provide for the admissibility of the legal conclusions contained within an otherwise permissible public report." *Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 302 (11th Cir. 1989). This is because "the jury would have no way of knowing whether the preparer of the report was cognizant of the requirements underlying the legal conclusions, and, if not, whether the preparer might have a higher or lower standard than the law requires." *Id.* at 303. However, "the amorphous line between 'factual' and 'legal' conclusions may obscure a practical analysis under this rubric." *Id.*

This court need not decide now whether the investigator's ROI determinations constitute factual or legal conclusions. At this stage, it may consider any evidence that *could be* presented in a form admissible at trial. *See* Fed. R. Civ. P. 56(c)(2).

8

Because the ROI qualifies as such, the court will consider it in deciding the present motion.[5]

### C.      Paragraph 13

Finally, Mr. Calhoun argues that Paragraph 13 in Secretary McHugh's statement of undisputed facts relates inadmissible hearsay and should thus be struck. Doc. 29 ¶¶ 12-13. The statement reads, "Mr. O'Connor reported that Mr. Calhoun was sleeping on the job when Mr. O'Connor was Mr. Calhoun's first line supervisor." Doc. 27 at 6 (citation omitted). Mr. Calhoun suggests that Secretary McHugh is improperly offering this fact for the truth of the matter asserted. *See* Doc. 29 ¶ 13. The Secretary denies this interpretation. Instead, he asserts that "it's proferred to show that *Mr. O'Connor reported that Mr. Calhoun was sleeping on the job* when Mr. O'Connor was [Mr. Calhoun's] supervisor, not to show that [Mr. Calhoun] was sleeping on the job." Doc. 40 at 5 (emphasis in original).

The Secretary does not explain this point further. He particularly fails to explain how he could reduce the fact that Mr. O'Connor made this specific report to admissible evidence at trial. Therefore, the Secretary has failed to adequately respond to Mr. Calhoun's evidentiary arguments. The court will thus sustain Mr. Calhoun's

---

[5]Mr. Calhoun does not identify which parts of the ROI he considers improper legal conclusions. To the degree the report does state any legal conclusions, the court will examine those parts de novo.

objection to Paragraph 13 and will not consider it in evaluating the Secretary's motion for summary judgment.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks omitted).[6] The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions,

---

[6]Congress amended Rule 56 in 2007 in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Fed. R. Civ. P. 56, Advisory Committee Notes, 2007 Amendments (emphasis added). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version. *E.g.*, *Wooten v. Walley*, No. 2:07-CV-701-WKW[WO], 2008 WL 4217262, at *2 n.5 (M.D. Ala. Sep. 12, 2008).

answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249 (internal citations omitted).

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a

11

directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* (citation omitted).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16 (citation omitted). First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17 (citation omitted). When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citation omitted). The second method a movant in this position may use to discharge its burden is to provide affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering evidence sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

12

S<small>TATEMENT OF THE</small> C<small>ASE</small>

## I.    Factual Background

With this standard in mind, the court summarizes the following basic case facts.[7] Mr. Calhoun is an African-American man. On December 18, 2006, he began his first term appointment as a "General Equipment Mechanic Helper" in the Tracked Systems Division of the Production Directorate at the Army Depot in Anniston, Alabama. His term was renewable and was initially scheduled to last until January 18, 2008. At the time of his hiring, his "first-line supervisor" was James McKinney – also an African-American man. Shortly afterward, Edgar O'Connor – an Asian-American man – replaced Mr. McKinney as Mr. Calhoun's "first-line" supervisor. David Funderburg, the Tracked Systems Division Chief and an African-American man, was Mr. Calhoun's "second-line" supervisor.

Mr. O'Connor's line, which included Mr. Calhoun, worked on the M-88 tank. As a mechanic helper, Mr. Calhoun drove a forklift and "worked in suspension" of the M-88. This included putting on brakes, tires, and hubs. Sometime in 2007 – before Mr. Calhoun's initial term had ended – Mr. O'Connor recommended that Mr.

---

[7]This summary does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court provides the summary simply to ground its legal analysis in the context of this particular case. Further, due to the nature of this court's decision on summary judgment, the following statement's scope is limited. The court has not included facts that are immaterial to the court's ruling on the defendant's motion.

Calhoun's term not be extended. After meeting with Mr. Calhoun and Mr. O'Connor, Mr. Funderburg decided to extend Mr. Calhoun's term.

The Tracked System Division's "Stryker line" included a Disassembly – or "tear down" – side and an Assembly – or "rebuild" – side. When Stryker tanks returned from a war zone, Disassembly workers stripped the tank down to the hull; Assembly workers rebuilt them. In January 2008, the Stryker line workload dramatically increased. To accommodate the increased production, management "borrowed" employees from other lines and recruited volunteers to transfer to the Stryker line. Mr. Calhoun volunteered, and his supervisors assigned him to the Stryker line as a mechanic helper. On that line, his first-line supervisor was Monroe Wood – an African-American – and William "Patrick" Webber – a Caucasian – was the "lead" person. His second-line supervisor remained Mr. Funderburg. In July 2008, Mr. McKinney became Mr. Calhoun's second-line supervisor after Mr. Funderburg deployed abroad.

Shortly after being assigned to the Stryker line in January 2008, Mr. Calhoun requested to work on the Assembly side. He asked Mr. Webber on one occasion and then asked Mr. Wood. Mr. Wood denied both requests. On or around March 7, 2008, Mr. Calhoun reported an on-the-job injury, and his supervisors placed him on "light" duty. He became dissatisfied with this work – which involved sweeping the work area

14

– and he again asked Mr. Wood to let him work on the Assembly side. Mr. Wood again denied the request.

Mr. McKinney counseled Mr. Calhoun on leave and attendance issues when Mr. McKinney was Mr. Calhoun's first-line supervisor on the M-88 line. When Mr. Calhoun joined the Stryker line, he experienced similar issues with his superiors. On March 19, 2008, Mr. Wood issued Mr. Calhoun a memorandum on "Instructions for Requesting Leave." On March 24, 2008, Mr. Wood sent Mr. Calhoun to leave counseling. Beginning in May 2008, Mr. Wood charged Mr. Calhoun "absent without leave" ("AWOL") on several occasions. Mr. Wood further asked that Mr. Calhoun be issued an official letter of leave instruction. Mr. Calhoun complained to his union in the spring or summer of 2008 regarding his workplace treatment. Relatedly, Mr. Judd Gedgoves[8] – a Caucasian co-worker of Mr. Calhoun's on the Stryker line – would also often "call in" late to report his absences.

Shortly after he returned to work in March 2008 following his work-related injury, Mr. Calhoun alleges that Mr. Wood made a serious of vulgar remarks to him. On July 16, 2008, Mr. Funderburg recommended that Mr. Calhoun's term not be

---

[8]This person's last name is spelled differently in various parts of the record – for instance, it appears in Mr. Calhoun's Response as "Gedgoudas," *e.g.*, doc. 30 at 8, and in Secretary McHugh's Reply as "Gedgoudes," *e.g.*, doc. 44 at 10. In Mr. Webber's testimony at the 8/19/09 Administrative Fact-Finding Conference, he spelled out – upon request – the last name as "G-e-d-g-o-v-e-s." Doc. 28-2 at 207. The court will therefore use the spelling "Gedgoves" in this opinion.

15

extended. On August 20, 2008, Mr. Wood notified Mr. Calhoun that his term would not be extended. On September 4, 2008, Mr. Calhoun reported to Mr. McKinney that Mr. Wood had made several inappropriate remarks to him during his time there. Mr. Calhoun reported the remarks to the Depot's Equal Employment Opportunity ("EEO") Office on the same day. In response, Mr. McKinney conducted an investigation on the matter and issued Mr. Wood a Letter of Warning on October 7, 2008. Mr. Calhoun's term appointment expired on October 14, 2008.

## II.    Procedural History

On June 12, 2009, Mr. Calhoun filed a formal EEOC complaint, alleging race and gender discrimination and reprisal. Doc. 28-8 at 2. On December 8, 2011, he filed the Complaint in this case. Doc. 1. On February 14, 2012, Secretary McHugh filed a motion to dismiss Count IV of the Complaint (42 U.S.C. § 1983) and "Fictitious Parties A, B, and C" – as well as to strike the punitive damages request. Doc. 6. The court granted this motion on May 14, 2012. Doc. 12. Secretary McHugh filed the current motion on May 13, 2013. Doc. 26. Mr. Calhoun responded on June 3, doc. 30, and the Secretary replied on July 8, doc. 44.

### DISCUSSION

Because Secretary McHugh need not prove liability at trial, he can meet his burden here either by (1) showing an absence of evidence to support Mr. Calhoun's

case; or (2) offering affirmative evidence demonstrating that Mr. Calhoun will be unable to prove his case at trial. *Fitzpatrick*, 2 F.3d at 1115-17. Mr. Calhoun alleges four claims against Secretary McHugh that are presently relevant:

- Race Discrimination – Disparate Treatment;

- Race Discrimination – Discriminatory Discharge;

- Retaliation; and

- Sexual Harassment – Hostile Work Environment.

Doc. 1 at 7-12.

The court will grant Secretary McHugh partial summary judgment. The Secretary fails to meet his burden on Mr. Calhoun's racial discrimination and retaliation claims, but he succeeds on Mr. Calhoun's sexual harassment claim. Mr. Calhoun has evidentially supported a prima facie case as to his disparate treatment, discriminatory discharge, and retaliation claims. Moreover, he has presented evidence which rebuts the nondiscriminatory and nonretaliatory reasons that Secretary McHugh offers for the adverse actions taken against him. However, Mr. Calhoun cannot prove that the vulgar comments his supervisor directed at him were sufficiently severe and pervasive to alter his employment terms and conditions. Thus, his sexual harassment claim will not survive summary judgment.

**I.     Mr. Calhoun Has Identified Genuine Factual Issues Over Whether He**

17

**Suffered Racial Discrimination.**

### A.     *Legal Framework*

Title VII prohibits an employer from discriminating against an employee in the terms and conditions of his or her employment on the basis of race. 42 U.S.C. 2000e-2(a)(1). Under this statute, a plaintiff like Mr. Calhoun must ultimately prove that his employer harbored discriminatory intent in treating him adversely during his employment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."). The plaintiff can prove discriminatory intent through either direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003).

Direct evidence of discriminatory intent is rare. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). Such evidence may take the form of facially-discriminatory employment policies, job assignments, or employer statements. *See, e.g, Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (holding that telephone-marketing corporation's pre-election campaign, in which African-American employees were assigned to call African-American voters using "black script," while white employees called white voters using "white script," was

direct evidence of disparate treatment on basis of race).

When a plaintiff seeks to prove discriminatory intent through circumstantial evidence, a court usually evaluates the claim under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).[9] Under this framework, the plaintiff first has the burden of proving a prima facie case by a preponderance of the evidence. In a racial discrimination claims such as Mr. Calhoun's, the plaintiff makes such a case by evidence that:

- he is a member of a protected class;

- he was subjected to adverse employment action;

- his employer treated similarly-situated white employees more favorably; and

- he was qualified to do the job.

*See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations omitted). Discharging this burden is not onerous. *Tex. Dep't of Cmty. Affairs v. Burdine (Burdine)*, 450 U.S. 248, 253 (1981). The plaintiff need only establish facts adequate to permit a discriminatory inference. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th

---

[9]In proving discriminatory intent circumstantially, a plaintiff need not conform rigidly to the *McDonnell Douglas* framework. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005) (emphasizing that the *McDonnell Douglas* framework "remains only one method by which the plaintiff can prove discrimination by circumstantial evidence" and that it "is not the exclusive means of proof") (citing *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982)).

Cir. 1997).

Once the plaintiff has made out the elements of the prima facie case, the burden of production shifts to the employer to articulate a non-discriminatory basis for its employment action. *Burdine*, 250 U.S. at 253 (citation omitted).[10] If the employer meets this burden, the discriminatory inference disappears, and the plaintiff must then show by a preponderance of the evidence that the proffered reasons were pretextual. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). Where the plaintiff succeeds in discrediting the employer's proffered reasons, the trier of fact may conclude that the employer intentionally discriminated. *Reeves*, 530 U.S. at 148.

Mr. Calhoun seeks to prove Secretary McHugh's discriminatory intent circumstantially. That is, he offers evidence from which (he claims) a fact-finder may infer that Secretary McHugh – though his subordinates – had a racially-discriminatory motive in (1) adversely treating him during his employment; and (2) not renewing his employment term when it completed. Mr. Calhoun makes his prima facie case on both counts. In response, the Secretary offers legitimate, nondiscriminatory reasons for Mr. Calhoun's adverse treatment. However, Mr. Calhoun rebuts these justifications by

---

[10]While the burden of production shifts, the burden of persuasion on the issue of discriminatory intent always remains with the plaintiff. *Burdine*, 250 U.S. at 253. ("The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (citations omitted).

identifying several valid factual disputes over whether the justifications are pretextual.

> **B.    Mr. Calhoun has made a prima facie case of racial discrimination because he was adversely treated when a similarly-situated white employee was not.**

Secretary McHugh admits that Mr. Calhoun, as a black male, is a member of a protected class and was qualified for his position with the Army. Doc. 27 at 16. The Secretary denies, however, that Mr. Calhoun suffered adverse employment actions or that he can identify a legitimate white "comparator" who was treated differently. *Id.* Mr. Calhoun alleges three discrete adverse employment actions taken against him that (he claims) cumulatively imply a discriminatory motive on his superiors' part. These alleged actions are:

- His supervisors denied him reassignment to the Stryker Assembly area;

- Monroe Wood, his first-line supervisor, improperly gave him AWOLs while he worked on the Stryker line; and

- His superiors did not renew his employment term.

Secretary McHugh challenges each action, although on different grounds. The court will address each challenge and then state these actions cumulatively satisfy Mr. Calhoun's prima facie case.

> 1.    *Denial of Reassignment*

21

Secretary McHugh maintains that denying Mr. Calhoun's reassignment request did not qualify as an adverse employment action. *Id.* at 16. He argues that such a decision was not sufficiently material to render Mr. Calhoun's prima facie claim actionable under the *McDonnell Douglas* scheme. *Id.* at 17-18. The Secretary is incorrect.

Of course, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001) (citations omitted); *see also Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) ("Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace.") (quotation and internal quotation marks omitted), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White (Burlington Northern)*, 548 U.S. 53 (2006); *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1137  (N.D. Ga. 2004) (quoting *Davis*, 245 F.3d at 1239, 1244) ("[A] court should not act as 'a super-personnel department' by second-guessing an employer's business judgment about where it assigns its employees."). Rather, "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239 (emphasis in original). Although this analysis "does not require proof of direct

economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* at 1239-40 (citation and footnote omitted). In short, the employment action must meet a "threshold level of substantiality" before it is cognizable. *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir. 1998).

Mr. Wood's denial of Mr. Calhoun's reassignment requests meets this threshold. Mr. Calhoun testified in his deposition that working in the Assembly area:

- involved greater responsibilities than Disassembly;

- improved one's mechanical skills in a way that could not occur in Disassembly;

- had superior working conditions; and

- entitled one to higher employment grades and thus higher potential compensation.

Doc. 28-2 at 73 ("With rebuild, you know, you can get higher grades. You can make more money. The more you learn about a tank, the more money you're eligible to

make."). Secretary McHugh does not directly dispute these claims.[11] Instead, the Secretary argues that Mr. Calhoun's reassignment denial cannot qualify as adverse because Mr. Calhoun cannot prove "that he would have experienced a change in pay or benefits had he been permitted to work in the assembly area." Doc. 27 at 17.

Such a concrete change is not necessary. Under the prima facie analysis, it is sufficient that reassignment to Assembly would have given Mr. Calhoun greater prestige, greater responsibilities, cleaner work conditions, and – most importantly – eligibility for pay increases. *See Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1300-01 (11th Cir. 2005) ("[I]f an employer's conduct negatively affects an employee's salary, title, position, or *job duties*, that conduct constitutes an adverse employment action . . . Similarly, a transfer to a less desirable position in terms of pay *or eligibility for pay increases* is an adverse employment action because it is equivalent to a demotion.") (citations omitted) (emphasis added); *McCabe v. Sharrett*, 12 F.3d 1558, 1564 (11th Cir. 1994) (concluding that employee's transfer to job that reduced her eligibility for salary increases – even though her salary had not decreased – still qualified as adverse employment action); *see also Barnhart v. Wal-Mart Stores, Inc.*,

---

[11]In his Reply, Secretary McHugh contests Mr. Calhoun's characterization of Assembly as "more favorable," pointing out that many workers preferred Disassembly. Doc. 44 at 9. But, the Secretary does not offer evidence contradicting Mr. Calhoun's assertion that Assembly had greater responsibilities, greater prestige, cleaner conditions, or eligibility for pay grade increases.

206 F. App'x 890, 893 (11th Cir. 2006) (unpublished) ("A lateral transfer that does not result in lesser pay, responsibilities, or prestige is not adverse. Likewise, the refusal to give an employee such a transfer cannot be an adverse employment action.") (internal citation and quotation marks omitted).

### 2.    *Similarly-Situated Employees*

Secretary McHugh next argues that Mr. Calhoun has not identified any suitable white comparators who were treated differently than he at the Anniston Depot. Doc. 27 at 18-19. The Secretary discounts Mr. Calhoun's proffered comparator, Judd Gedgoves – a white man and Mr. Calhoun's fellow employee on the Stryker line. *Id.* at 19. Mr. Calhoun asserts that, like himself, Gedgoves had attendance issues in the spring and summer of 2008. Doc. 1 ¶ 35. However, the Stryker line supervisors did not punish Gedgoves similarly. *Id.* In response, Secretary McHugh claims that Gedgoves was not "similarly situated" to Mr. Calhoun because Gedgoves's conduct differed from Mr. Calhoun's in several material respects. Doc. 27 at 19. These alleged differences include the following:

- although Gedgoves was frequently late, he would – unlike Calhoun – still call in to notify his superiors;

- unlike Calhoun, he was not issued a leave restriction letter; and

- unlike Calhoun, his attendance improved after being counseled.

*Id.* According to Secretary McHugh, because the "quantity and quality" of Gedgoves's misconduct was not "nearly identical" to Mr. Calhoun's, Gedgoves does not qualify as a suitable comparator under *McDonnell Douglas*. *Id.* at 18 (quoting *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006)).

The Secretary has misstated the prevailing prima facie standard within this circuit. Gedgoves's conduct did *not* have to be "nearly identical" to Mr. Calhoun's. Instead, Godgoves's conduct only had to be "similar" to Mr. Calhoun's to qualify as a comparator. *See Holifield*, 115 F.3d at 1562 ("In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same *or similar* conduct and are disciplined in different ways.") (emphasis added) (citation omitted).[12]

---

[12]The court is aware that, two years after *Holifield* was decided, an Eleventh Circuit panel stated in a published decision that a co-employee's misconduct had to be "nearly identical" to a plaintiff's before the co-employee may qualify as a comparator in a Title VII discrimination case. *Maniccia*, 171 F.3d at 1368-69 (citing *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir. 1989)) ("We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.").

This articulation of the "similarly situated" standard is stricter than that stated earlier in *Holifield*. Additionally, at least some post-*Maniccia* published opinions of the Eleventh Circuit have hewn to the *Holifield* articulation and have disavowed *Maniccia*'s. *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1334 (11th Cir. 2000) ("Moreover, the law does not require that a 'similarly situated' individual be one who has 'engaged in the same or nearly identical conduct' as the disciplined plaintiff. Instead, the law only requires 'similar' misconduct from the similarly situated comparator.") (citations omitted), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003); *Anderson v. WBMG-42*, 253 F.3d 561, 565 (11th Cir. 2001) ("In arguing that the conduct of comparator employees must be the same or nearly identical, WBMG takes the same position rejected by this Court in *Alexander v. Fulton*

Still, a plaintiff must show that he and the identified comparator(s) are similarly situated in all relevant respects. *Id.* (citations omitted). This analysis involves comparing the nature of (1) the offenses committed, and (2) the punishments imposed. *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008). If the plaintiff fails to prove a legitimate comparator exists, summary judgment is appropriate where no other discrimination evidence is present. *Holifield*, 115 F.3d at 1562.

Gedgoves engaged in sufficiently similar conduct as Mr. Calhoun to qualify as a comparator for Mr. Calhoun's prima facie case. Mr. Calhoun claims that Gedgoves would – like Mr. Calhoun – frequently miss work or come in late during their time together on the Stryker line. However, according to Mr. Calhoun, Gedgoves:

- never called in;

- was never given AWOLs;

---

*County*."); *but see Burke-Fowler*, 447 F.3d at 1323 n.2 (discounting *Alexander*'s interpretation – – without mentioning *Holifield* – and determining that *Maniccia*'s holding was in fact the first one issued on the degree of similarity required between a plaintiff's conduct and that of his or her proffered comparator); *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (same).

Because the panel in *Holifield* was the first to issue a published holding on the degree of similarity required for a comparator, this court must follow *Holifield*'s holding. *See e.g.*, *United States v. Moody*, No. 13-10521, 2014 WL 351602, at *1 (11th Cir. Feb. 3, 2014) (unpublished) (quoting *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir.1997)) ("[T]he law of this Circuit is 'emphatic' that only the Supreme Court or this Court sitting en banc can judicially override a prior panel decision.").

- was never required to bring in doctor's excuses; and

- was never otherwise reprimanded for his similar conduct.

Doc. 28-1 at 37. Secretary McHugh admits that Gedgoves "was late a couple of times calling in to work when he was taking leave." Doc. 44 at 12-13. The Secretary denies, on the other hand, that Gedgoves was never reprimanded. He instead maintains that Gedgoves "was written up and counseled for not calling in to work in a timely fashion, and, once counseled, Gedgoves corrected his behavior." *Id.*

The Secretary also objects that whether Gedgoves was required to bring in doctor's excuses is immaterial to the court's analysis. *Id.* at 12. Mr. Wood's "primary concern with Calhoun . . . was Calhoun's failure to properly request leave" – not whether he had doctor's excuses for his absences. *Id.* Finally, Secretary McHugh acknowledges that Mr. Wood's leave records for Gedgoves do not reflect an AWOL designation. *Id.* at 13. But, the Secretary once again objects that this fact is immaterial because Gedgoves was not similarly situated to Mr. Calhoun. *Id.*[13] Unlike Mr. Calhoun, Gedgoves had "plenty of annual and sick leave to use," and he corrected his behavior after counseling. *Id.*

---

[13]The Secretary notes that Mr. Calhoun has admitted that Gedgoves was in fact assigned an AWOL in October 2008 – after Mr. Calhoun had left the Anniston Army Depot. *Id.* This is correct. *See* Doc. 30 at 9. But, it does not undermine Mr. Calhoun's claim because he complains that Gedgoves was not issued an AWOL *during their time together on the Stryker line*. *See* note 17.

Altogether, Mr. Calhoun has demonstrated that Gedgoves's situation and conduct were sufficiently similar to Mr. Calhoun's to qualify Gedgoves as a comparator. Like Mr. Calhoun, Gegoves worked on the Stryker line. The Secretary admits Gedgoves had attendance problems – like Mr. Calhoun. The Secretary also acknowledges that Gedgoves was punished differently than Mr. Calhoun. Of course, Secretary McHugh maintains there are legitimate, nondiscriminatory reasons why Gedgoves was punished differently. However, the court is not concerned with such justifications at the prima facie stage. Mr. Calhoun has revealed that he and Gedgoves occupied *similar* positions, committed *similar* offenses, and yet suffered *different* punishments. This is sufficient for Mr. Calhoun to meet his prima facie burden.

### 3.   Nonrenewal

Finally, Secretary McHugh disputes that Mr. Calhoun was technically discharged from his position at the Anniston Army Depot. Doc. 27 at 19-20. The Secretary claims instead that Mr. Calhoun's term appointment expired, and his superiors decided not to renew it. *Id.* at 20. According to the Secretary, this does not qualify as a termination, and thus Mr. Calhoun's discriminatory discharge claim is not legally cognizable. *Id.*

Under the *McDonnell Douglas* scheme, this is a distinction without a difference. Although Mr. Calhoun characterizes his claim as a  "discriminatory

discharge" in his Complaint, the relevant issue – for prima facie purposes – is not whether Mr. Calhoun was technically discharged. It is whether he suffered an "adverse employment action." *See, e.g.*, *Davis*, 245 F.3d at 1238 ("Courts have uniformly read this language to require a plaintiff suing under § 2000e–2(a) to establish, as part of his prima facie case, that he suffered so-called 'adverse employment action.'"). The nonrenewal of his term-employment contract qualifies as such an action.[14] *See Giles v. Daytona State Coll, Inc.*, No. 13-11081, 2013 WL 5764659, at *3 (11th Cir. Oct. 25, 2013) (unpublished) ("Although the 2010 nonrenewal of the annual contract was an adverse employment action, [the plaintiff] did not demonstrate that [the defendant] treated similarly situated employees more favorably."); *Saridakis v. S. Broward Hosp. Dist.*, 681 F. Supp. 2d 1338, 1348-49 (S.D. Fla. 2009) (finding non-renewal of contract to be adverse employment action for purposes of Title VII discrimination claim); *Thomas v. Dade County Pub. Health Trust*, 177 F. Supp. 2d 1283, 1291 (S.D. Fla. 2001) (observing that it was "undisputed" that a physician-plaintiff whose annual residency contract was not renewed was subjected to adverse action).

    4.    *Cumulative Impact*

---

[14]It is also relevant to the court's prima facie analysis that Gedgoves's term was renewed when Mr. Calhoun's was not. Doc. 1 ¶ 36. Secretary McHugh does not contest this fact.

So far, the court has individually assessed Mr. Calhoun's adverse employment claims. However, the court must also consider whether these alleged actions are collectively adverse. *See Akins*, 420 F.3d at 1301 (citing *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)) ("In deciding whether employment actions are adverse, we consider the employer's acts both individually and collectively.") (footnote omitted). The court finds that they do. Mr. Calhoun has shown that – in the space of several months – he was:

- repeatedly denied lateral reassignment to a position with superior conditions, greater responsibilities, and entitlement to pay grade increases;

- charged AWOLs that were permanently added to his records; and

- denied renewal of his employment contract.

Even if any of these actions were not discretely "adverse," they are certainly so when evaluated cumulatively. *See Shannon*, 292 F.3d at 716 ("While the other actions of which [the plaintiff] complains might not have individually risen to the level of adverse employment action under Title VII, when those actions are considered collectively, the total weight of them does constitute an adverse employment action.") (internal quotation marks and citation omitted). Moreover – as already discussed – Mr. Calhoun has identified a suitable white comparator who was treated differently than he was. He has thus made a prima facie case of disparate treatment.

**C.    Mr. Calhoun successfully rebuts Secretary McHugh's stated reasons for treating him adversely during his employment at the Depot.**

In response to Mr. Calhoun's prima facie claims, Secretary McHugh offers performance-based reasons why each adverse action taken against Mr. Calhoun was made. With the burden reverting back to him, Mr. Calhoun produces triable issues over whether these reasons were simply pretext for racial discrimination. The court will examine the  parties' respective arguments on each point.

*1.    Legal Framework*

In order to rebut an employee's prima facie case successfully, an employer must "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 255 (footnote omitted). The employer must be sufficiently specific so as to give the plaintiff "a full and fair opportunity to demonstrate pretext." *Id.* at 255-56. The employer need not prove, however, "that it was actually motivated by the proffered reasons." *Id.* at 254 (citation omitted). Rather, it need only produce evidence of its nondiscriminatory termination rationale sufficient to raise a genuine factual issue as to whether it discriminated against the plaintiff. *Id.* (footnote omitted). If it does so, it has rebutted the employee's case.

Once the employer meets its burden to produce a nondiscriminatory reason for

its actions, the presumption of discrimination disappears. *Reeves,* 530 U.S. at 142-43 (citations omitted). To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact-finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were instead a pretext for discrimination. *Id.* at 143. "A plaintiff can demonstrate pretext either directly by persuading the court that a discriminatory or retaliatory reason 'more likely motivated the employer,' or indirectly by showing 'the employer's proffered explanation is unworthy of credence.'" *Wiggins v. Sec'y, Dep't of Army*, 520 F. App'x 799, 800-01 (11th Cir. 2013) (unpublished) (quoting *Burdine,* 450 U.S. at 256).

How the plaintiff meets this burden alters when his or her employer offers multiple nondiscriminatory reasons for their termination. Generally, "if the plaintiff cannot create a genuine issue of material fact regarding whether *each* of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Moore v. Jefferson County Dep't of Human Res.*, 277 F. App'x 857, 859 (11th Cir. 2008) (unpublished) (emphasis added) (citing *Cooper v. S. Soc.*, 390 F.3d 695, 725 (11th Cir. 2004)). Whether this injunction applies, however, depends on whether the employer's articulated reasons qualify as independent bases for termination. There are cases where "the multiple grounds offered by the defendant are not truly independent but are so intertwined that the taint by an issue of fact as to one

such reason undermines the other reasons as well." *Strickland v. Prime Care of Dothan*, 108 F. Supp. 2d 1329, 1334-35 (M.D. Ala. 2000) (citing *Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995)) (internal quotation marks omitted).

        2.    *Denial of Reassignment*

     Secretary McHugh adequately rebuts Mr. Calhoun's prima facie case on the denial of his transfer request. The Secretary argues that Mr. Calhoun did not have the requisite electrical experience to work on the Assembly area when he arrived on the Stryker line in January 2008. Doc. 27 at 26-27. In support, the Secretary cites Mr. Webber's testimony at the Administrative Fact-Finding Conference on August 19, 2009. *Id.* at 28. Mr. Webber was the "lead man" on the Stryker line's second shift with Mr. Calhoun in January 2008. Doc 28-2 at 199-200. As lead man at that time, he was involved in assigning incoming workers to either Assembly or Disassembly. *Id.* at 205. Webber testified that his decision-making as to these assignments operated in the following manner:

> First, we would look at if they had any electrical experience beforehand, because that was really the major items that we needed, was the doing the drive compartment. And if none of them had that, then what we did, we'd bring everybody in on the disassembly . . . Then they had the opportunity, after they learned the vehicle and they wanted to move to a different part, the assembly part, then they were able to move to a different part of the assembly part.

*Id.* at  202. Because Mr. Calhoun lacked electrical experience – a substantive

prerequisite for the job – Webber assigned him to Disassembly. *See id.*

Secretary McHugh adds another nondiscriminatory rationale for Mr. Calhoun's treatment in this regard: his physical limitations. Doc. 27 at 27. The Secretary emphasizes that Mr. Calhoun was injured two months into his time on the Stryker line and placed on "light duty." *Id.* After that time – according to the Secretary – Mr. Calhoun could not have sustained the rigorous Assembly-line duties. *See id.* Mr. Webber seconded this judgment in his conference testimony. According to Webber, Mr. Calhoun's injury-related restrictions prevented him from getting inside vehicles and lifting anything heavy – both requirements for Assembly work. Doc. 28-2 at 204-05. Consequently, Mr. Calhoun could only sweep and clean up around the work area. *Id.* at 205.

Mr. Calhoun vigorously disputes this account, and he argues that the Secretary's supposed justifications instead acted as a pretext for segregating black workers like himself in Disassembly. Contrary to the Secretary's assertions otherwise, Mr. Calhoun maintains that he indeed had relevant prior experience for Assembly work. Doc. 28-1 at 30. Specifically, he claims he did rebuild-type work during his previous experience on the M-88 line. *Id.* This work included putting on brakes, tires, hubs – "basically anything dealing with the suspension of the tanker gear." *Id.* Mr. Calhoun emphasizes that this rebuild experience was all that was needed for

35

assignment to Stryker Assembly. Doc. 30 at 6-7. According to Mr. Calhoun, *no one arriving on the Stryker line with him in early 2008 had specialized experience with the Stryker vehicle. Id.* In his account, everyone needed training – regardless of electrical experience.[15]

Mr. Calhoun essentially argues that his experience – or lack thereof –  had nothing to do with the refusal of his transfer request. Instead, he claims his supervisors placed him (and kept him) in Disassembly because of his race. He points foremost to the racial distribution of work assignments on the Stryker line:

> Eight employees, including Calhoun, came to the Stryker vehicle at the same time. Four of those employees were white males who were placed in rebuild.
>
> Three black males were placed in tear down. One black female was placed in parts. All employees had to be trained on the job.

*Id.* at 7 (internal citations omitted). Further, Mr. Calhoun claims Mr. Wood relied exclusively on Mr. Webber – a white male – in making these assignment decisions.

---

[15]Mr. Calhoun also disputes the notion that his March 2008 injury would have prevented him from Assembly work. From his brief:

> Calhoun states the work in rebuild was not too strenuous, and he would have been able to perform the work in rebuild. Two to three people work on the same thing in rebuild, so heavy lifting would not [have been] a problem. The tank would not have been too cramped for Calhoun, as Woods [sic] already had Calhoun in the tank picking up trash. The wiring would not have been repetitive and continuous movement of his shoulder [sic] as was the sweeping that Calhoun was required to perform.

*Id.* at 7-8 (internal citations omitted).

*Id.*

In his administrative conference testimony, Mr. Wood acknowledged the possible accuracy of Mr. Calhoun's racial distribution estimate. Doc. 28-2 at 53-54. Wood also admits relying on Webber in making assignment decisions because he had "no knowledge of how the tank or vehicle operated or whatever." *Id.* at 91. But, Wood claimed the numbers turned out that way because only those who had "mechanical experience on previous combat-type vehicles" could work on Assembly. *Id.* at 54. According to Wood, Mr. Calhoun had mostly driven a forklift on the M-88 line. *Id.* at 55. Mr. Calhoun contested this description in his own conference testimony. He alleged Wood knew that he had proper mechanical experience on the M-88 line because Wood worked as a supervisor right next to him during that time. *Id.* at 78.

Mr. Calhoun has identified several factual disputes regarding his supervisors' refusal to place him in Assembly. These disputes encompass legitimate arguments over:

- the degree and sufficiency of his mechanical experience;

- whether Assembly specifically required electrical experience (or whether general mechanical experience was adequate);

- whether any of those workers assigned to Assembly already had the supposedly-required electrical experience;

- the degree to which Wood relied on Webber in making assignment decisions;

- what Calhoun's physical limitations were after his injury;

- whether they prevented him from performing Assembly duties; and

- what the racial allocation was between Assembly and Disassembly in early 2008.

These disputes are sufficiently material to allow Mr. Calhoun's disparate treatment claim to survive summary judgment. They credibly undermine Secretary McHugh's rationale for denying his transfer request, and they plausibly reveal a pretextual motive to racially discriminate against him in doing so. This is enough to submit the matter to a jury. *See Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) ("[A] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, and that discrimination was the real reason.'") (emphasis in original) (quotation omitted).

2.    *AWOLs*

A similar dynamic unfolds regarding Mr. Calhoun's complaints that his supervisors improperly charged him AWOL during his time on the Stryker line. The Secretary counters that the charges occurred because Mr. Calhoun refused to follow established leave procedures. Doc. 27 at 27. Specifically, the Secretary claims that

Wood punished Mr. Calhoun with AWOL on May 13, May 27, and June 9-11, 2008, because Mr. Calhoun repeatedly failed to request permission for unscheduled leave he was taking.  Doc. 44 at 32.

Violations of work rules are legitimate, nondiscriminatory reasons to treat an employee adversely. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). However, an employer's claim that this defense applies is "arguably pretextual" when the employee submits evidence that:

- he did not violate the cited work rule; or

- if he did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated.

*Bush v. Houston County Comm'n*, 414 F. App'x 264, 267 (11th Cir. 2011) (unpublished) (quoting *Damon*, 196 F.3d at 1363). If the employee argues that he did not violate the cited work rule, "the ultimate issue is whether the decisionmaker believed that the employee violated the rule, not whether the employee actually violated the rule." *Id.* (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). That is, "an employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Smith v. Int'l Paper Co.*, 160 F. Supp. 2d 1335, 1346 (M.D. Ala. 2001) (citing *Damon*, 196 F.3d at 1363 n.3). Rather, "the employee must point

to evidence which raises a question as to whether the decisionmaker, in fact, knew that the violation did not occur and, despite this knowledge, fired the employee based upon the false premise of an alleged work rule violation." *Sweeney v. Ala. Alcoholic Beverage Control Bd.*, 117 F. Supp. 2d 1266, 1273 (M.D. Ala. 2000).

In response to the Secretary's claims, Mr. Calhoun both disputes that he violated the leave-request policies and highlights the disparate treatment Mr. Gedgoves received for similar conduct. On the first front, he admits the following facts:

- On March 19, 2008, Mr. Wood issued him a memorandum of instructions for requesting leave;

- On March 24, 2008, Mr. Wood sent him to leave counseling;

- In May 2008, Mr. Wood charged him with AWOL; and

- Mr. Wood requested that he be issued an official letter of leave instruction.

Doc. 30 at 9-10. However, Mr. Calhoun still claims that he followed leave-procedure instructions by calling or telling Mr. Wood "each and every time" he was absent. *Id.* at 9. He underscores certain admissions Mr. Wood made in his deposition testimony that undermine Wood's criticisms of his attendance conduct. *Id.* Specifically, Wood admitted that:

- he was "always" aware when Calhoun was having a doctor's

appointment;

- he did not notify Calhoun beforehand of the class Calhoun missed on June 9-11, 2008 (for which Wood charged him AWOL); and

- there were discrepancies in his notes from that period, including that they were not chronologically-ordered and that they might not have been his original copies.

*Id.* Mr. Calhoun further notes that Wood had to remove some of his original AWOL charges after Mr. Calhoun complained to his union that they were unjustified. *Id.* Mr. Calhoun therefore suggests that Wood punished him with AWOL *even though* he knew Mr. Calhoun was following the rules.

In reply, Secretary McHugh admits that (1) Wood acknowledged certain inconsistencies in his records from the time in question and that (2) Wood had to remove (or otherwise change) certain AWOL charges he had originally given Mr. Calhoun. Doc. 44 at 15. But, the Secretary reiterates that Mr. Wood charged Mr. Calhoun with AWOL because Mr. Calhoun did not call in on May 13, May 27, and June 9-11, 2008. *Id.* at 32. He cites Mr. Webber's testimony at the fact-finding conference that "Calhoun continued to fail to call in despite being repeatedly counseled." *Id.*

Mr. Calhoun also contrasts his treatment in this arena with that accorded Mr. Gedgoves. As noted above, Gedgoves was a white employee who worked on the

Stryker line with Mr. Calhoun during the relevant time period.[16] Mr. Calhoun asserts that "Gedgoves would fail to call in or come in late weekly and sporadically, and was never given AWOLs or reprimanded for his identical conduct as Calhoun's alleged conduct." Doc. 30 at 32. In his testimony, Mr. Calhoun elaborated in the following manner:

> [T]here [were] a lot of times I was out due to doctor's excuse or me going to the doctor and I was placed on AWOL, but in the same breath, [Gedgoves] was out, he didn't have no doctor's excuse, none of that, and he wasn't placed on AWOL; white male, black male.

Doc. 28-1 at 53. Mr. Calhoun further observes that, although Wood claimed in his deposition that he gave Gedgoves AWOLs for this conduct, there is no documentary evidence of such during the time they worked together. Doc. 30 at 9.

In reply, the Secretary admits that Gedgoves "was late a couple times calling in to work when he was taking leave." Doc. 44 at 12. As detailed above, however, the Secretary denies that Gedgoves was similarly situated to Mr. Calhoun. In the Secretary's account, "Gedgoves was written up and counseled for not calling in to work in a timely fashion, and once counseled, Gedgoves corrected his behavior. In contrast, Calhoun, once counseled, did not correct his behavior." *Id.* at 12-13. The Secretary also highlights the fact that Gedgoves, as a veteran, had more annual leave

---

[16]The parties dispute whether Gedgoves worked exclusively on Assembly or divided his time between there and Disassembly.

and sick leave to use per pay period than Mr. Calhoun did. *Id.* at 13. Finally, the Secretary admits that the record does not reflect Gedgoves being charged with AWOL. *Id.* However, he notes that Mr. Calhoun admitted in his opposition brief that Gedgoves received an AWOL in October 2008 after Mr. Calhoun left the Depot. *Id.* at 13-14.

For the reasons summarized in the previous section, the court concludes as a matter of law that Mr. Gedgoves may act as Mr. Calhoun's comparator. *See supra* pp. 25-29. Given this conclusion, Mr. Calhoun has identified several genuine areas of material factual dispute bearing on whether the Secretary's justifications for Mr. Calhoun's AWOL charges are pretextual. These areas include:

- whether Calhoun followed proper leave procedures after his March 2008 injury;

- relatedly, whether Calhoun – and to what degree – Calhoun informed Wood when these absences occurred (or were to occur);

- how much available scheduled leave Calhoun had obtained by that point;

- whether Calhoun's supervisors imposed different leave-request requirements on him than on Gedgoves;

- on what grounds Wood punished Calhoun for his absences in spring 2008 – i.e. whether it was for failing to call in (either ahead of time or contemporaneously) or whether it was for failing to bring in doctor's excuses; and

- how and why certain AWOL charges on Calhoun's record were removed.

In other words, Mr. Calhoun has marshaled evidence plausibly suggesting that his employer penalized him for a work-rule violation that he did not commit – *and* which his employer knew he did not commit. Moreover, Mr. Calhoun has identified a legitimate white comparator who was handled differently, despite committing arguably-similar violations.[17]

### 3. Nonrenewal

Secretary McHugh cites similar performance concerns in justifying Mr. Calhoun's nonrenewal. He claims that "Mr. Funderburg based his recommendation not to extend [Mr. Calhoun's] term on [his] work record, attendance and performance, including sleeping on the job, as documented by all of Mr. Calhoun's first-line supervisors." Doc. 27 at 28. The Secretary emphasizes that Mr. Calhoun's work issues predated his arrival on the Stryker line. He notes that (1) Mr. McKinney counseled Mr. Calhoun on leave and attendance issues when McKinney was his first-line supervisor on the M-88 line and (2) Mr. O'Connor had recommended that Mr. Calhoun's original term not be extended. *Id.* at 29. The Secretary argues that the court

---

[17]Mr. Calhoun's complaint is that Gedgoves was not charged AWOL for violating leave procedures *at the same time Mr. Calhoun was penalized for similar accusations.* The fact that Gedgoves was charged with AWOL *after Mr. Calhoun left the Depot* – which Mr. Calhoun admits – is thus not relevant and does not undercut Mr. Calhoun's arguments.

should grant him summary judgment on the issue because Mr. Calhoun "cannot show that the Army's reasons for not extending his term appointment were unworthy of credence or more than likely motivated by race." *Id.* at 30.

In response, Mr. Calhoun again challenges these reasons as mere pretext for racial discrimination. He maintains that Funderburg relied *solely* on Wood's documentation in declining to renew his term. Doc. 30 at 13. Wood's records reflected that Mr. Calhoun was "not staying on the job, not coming to work, not reporting to work on time, not calling in." *Id.* According to Mr. Calhoun, it was this diagnosis – infected by racial discrimination – that actually accounted for his nonrenewal. *See id.*

Further, Mr. Calhoun denies having any attendance problems before his injury. He stresses Wood's deposition admission that he did not have problems with Mr. Calhoun's attendance before giving him the leave instruction letter on March 18, 2008. Doc. 30 at 33. Mr. Calhoun further claims that Mr. O'Connor recommended nonrenewal of his original term in 2007 because Mr. Calhoun had complained about the disparate racial composition of the M-88 line. *Id.* at 14. In a larger sense, Mr. Calhoun maintains his superiors purposely altered his records and otherwise fabricated performance issues in order to create a "stated reason" for nonrenewal. Doc. 30 at 34.

In his deposition testimony, Mr. Funderburg corroborated many of Mr. Calhoun's assertions. Funderburg acknowledged that Mr. Calhoun had complained to him about the racial configuration of the M-88 line. Doc. 28-3 at 10-11. Indeed, he implicitly admits that there were racial disparities on the line – but found that the black employees wanted to stay where they were. *Id.* at 11. Funderburg also admits that he relied on Mr. Wood's documentation in declining to recommend Mr. Calhoun for renewal. *Id.* at 13, 18-19.

Other parts of the record support Mr. Calhoun's claims. Wood testified in his deposition that he "didn't have a problem" with Mr. Calhoun's attendance prior to his injury. Doc. 28-6 at 18. Moreover, Mr. O'Connor – who had supposedly recommended that Mr. Calhoun not be renewed – reported to the EEOC investigator that he was "unaware" of any attendance problems by Mr. Calhoun prior to March 2008. Doc. 28-8 at 17.

These facts undercut Secretary McHugh's narrative that Mr. Calhoun had continuous attendance and performance issues from the beginning of his employment at the Anniston Army Depot. Mr. Calhoun has, in turn, marshaled considerable evidence that there were disparities in the treatment of black and white employees at the Depot. Moreover, he has offered individualized evidence that his superiors punished him differently for similar conduct as a white counterpart – a white

counterpart whose term was ultimately renewed. Considering this evidence altogether, the court finds that a reasonable fact-finder could agree with Mr. Calhoun that his Army supervisors used his supposed performance issues as a pretext for racially discriminating against him.

## II.   Mr. Calhoun Has Identified Genuine Factual Issues Over Whether He Suffered Illegal Retaliation.

### A.   *Legal Framework*

Under Title VII, it is illegal for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). As with a disparate treatment claim, a plaintiff alleging a Title VII retaliation claim must begin by establishing a prima facie case. The plaintiff must show that:

- he engaged in statutorily-protected activity;

- an adverse employment action occurred; and

- the adverse action was causally related to the plaintiff's protected activity.

*Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995). If a plaintiff makes out a prima facie case, the burden shifts to the defendant

47

to produce legitimate reasons for the adverse employment action. *Shannon*, 292 F.3d at 715 (citation omitted). "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." *Id.* (citation omitted).

> **B.**   ***Mr. Calhoun has made a prima facie case of retaliation because he engaged in protected opposition to unlawful employment practices.***

In his Complaint, Mr. Calhoun claims that he suffered illegal retaliation when he was terminated for "objecting to and reporting acts of racial discrimination and sexual harassment." Doc. 1 ¶ 56. Secretary McHugh argues that Mr. Calhoun cannot prove this claim because he cannot show that he participated in "prior protected activity." Doc. 27 at 20. The Secretary implicitly acknowledges that Mr. Calhoun engaged in protected activity when he reported his complaints to the EEOC Office on September 4, 2008. However, the Secretary emphasizes that this happened *after* (1) Mr. Funderburg prepared his letter recommending Mr. Calhoun not be extended and *after* (2) Mr. Wood notified Mr. Calhoun that his term would not be renewed. Doc. 27 at 21. Mr. Calhoun's EEOC complaints thus could not have motivated any adverse actions taken against him. The Secretary further denies that Mr. Calhoun's earlier complaints to his union qualified as "prior protected activity" because "the focus with the union was on his AWOL charges and not on discrimination." *Id.* (citation omitted).

48

Under 42 U.S.C. § 2000e-3(a), there are two types of protected activity: (1) opposing unlawful employment practices (the "opposition clause") and (2) making a charge or participating in an investigation or proceeding (the "participation clause"). *Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 555 U.S. 271, 274 (2009). Mr. Calhoun claims protection under the opposition clause. Doc. 30 at 34. Specifically, he claims he engaged in protected "opposition" on two occasions:

- When he was on the M-88 line, he complained of racial discrimination to Mr. O'Connor and Mr. Funderberg in the allocation of work assignments; and

- On several occasions after his March 2008 injury, he complained to his union about racial segregation, disparate treatment, sexual harassment and improper disciplinary punishment that he was experiencing on the Stryker line.

*Id.* at 37. After these complaints, Mr. Calhoun claims that his supervisors unlawfully charged him with AWOL, refused his request to place him in Assembly, and declined to renew his employment term. *Id.*

Mr. Calhoun's conduct qualifies as protected activity. "[A] plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (citation omitted). The plaintiff's burden here has

49

both a subjective and an objective component. *Id.* That is, "[a] plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Id.* (emphasis in original).

Mr. Calhoun has satisfied this burden here. The parties dispute the subject of Mr. Calhoun's complaints to his union in the spring and summer of 2008. While Mr. Calhoun claims that he challenged the racial segregation, disparate treatment, sexual harassment and AWOLs that he was experiencing on the Stryker line, Secretary McHugh asserts that Mr. Calhoun *only* discussed the AWOLs. Doc. 27 at 21. This distinction is immaterial here. Mr. Calhoun believed that he was being illegally charged AWOL *because of* his race. As assessed in the previous section, the court finds that this belief was objectively reasonable "in light of the facts and record presented." *Little*, 103 F.3d at 959-60. Therefore, in complaining about the matter to his union, Mr. Calhoun was opposing an unlawful employment practice. This constitutes protected activity. *See EEOC v. Total Sys. Servs.*, 240 F.3d 899, 903 (11th Cir. 2001) (Barkett, J., dissenting) ("[T]he EEOC has identified a number of examples of 'opposing' conduct that are protected by Title VII, including 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices.') (quoting *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579-80

(6th Cir. 2000)).

Moreover, Secretary McHugh admits that Mr. Calhoun complained earlier to Mr. Funderburg about "blacks on the M88 line being in the suspension area and not working on the front line." Doc. 44 at 7. The Secretary argues, however, that this fact is immaterial because "Calhoun's claims in this case arose during 2008 while he was assigned to the Stryker line and not while assigned to the M88 line prior to 2008." *Id.* While the timing of Mr. Calhoun's complaints on this subject might bear on whether they were causally related to the adverse treatment he later suffered, it does not affect whether the complaints themselves qualified as protected activity. Racial segregation in allocating work assignments constitutes an unlawful employment practice under Title VII. The court thus holds that Mr. Calhoun's earlier complaints on the subject also qualify as protected activity.[18]

### C.   *Mr. Calhoun successfully rebuts Secretary McHugh's stated reasons for treating him adversely during his employment at the Depot.*

In response to Mr. Calhoun's prima facie case, Secretary McHugh offers the same justifications for Mr. Calhoun's adverse treatment that he offered in defense of Mr. Calhoun's racial discrimination claims. The court will not rehash them here.

---

[18]In his Motion, Secretary McHugh does not challenge the other elements of Mr. Calhoun's prima facie burden – i.e. whether he suffered adverse treatment and whether this treatment was "causally related" to his prior protected activity. The court will thus assume – for the purposes of resolving this motion – that Mr. Calhoun has satisfied these elements.

Instead, the court will examine each adverse action and show how Mr. Calhoun has raised genuine issues of material fact regarding whether the Secretary's stated justifications were pretext for retaliation against Mr. Calhoun.

A plaintiff who wishes to expose his or her employer's offered non-retaliatory reasons as pretext must show that the employer's actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quotation omitted). "Such a determination is inherently fact-specific and 'depend[s] upon the particular circumstances' of the case." *Allen v. S. Commc'ns Servs., Inc.*, No. 2:11-CV-4097-LSC, 2013 WL 4012229, at *7 (N.D. Ala. Aug. 5, 2013) (quoting *Burlington Northern*, 548 U.S. at 68).

### 1. Denial of Reassignment

The Secretary maintains that Mr. Calhoun was unqualified – and later physically incapable – to work on Assembly and that these reasons alone motivated his superiors to deny his requests to be assigned there. Based on the grounds identified in the previous section on this matter, *see supra* pp. 33-38, the court finds that Mr. Calhoun has raised a genuine factual issue over whether whether the Secretary's stated reasons were "not what actually motivated [his] conduct." *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994) (citations omitted). Because the evidence Mr. Calhoun marshaled to discredit the Secretary's stated rationale was

not specific to the racial discrimination context, the court finds that it also bolsters Mr. Calhoun's retaliation claim. In other words, a reasonable jury could conclude from Mr. Calhoun's evidence that Secretary McHugh actually denied Mr. Calhoun reassignment to Assembly in retaliation for his protected activity. The court also finds that refusing to transfer Mr. Calhoun to Assembly "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" because of the advantages accrued from working on that shift. *Burlington Northern*, 548 U.S. at 68.

    *2.    AWOLs*

        Regarding his AWOL charges, Mr. Calhoun offers independent evidence to rebut the Secretary McHugh's offered justifications and expose them as pretext for retaliation. Mr. Calhoun claims that he first complained to his union when Wood began making vulgar remarks at him shortly after his injury on March 7, 2008. Doc. 30 at 37. He also testified that he returned to complain to the union in April or May of that year, and later in June or July. *Id.* Mr. Calhoun further specifies that he spoke to – among others – Ray Vanshoebrook, Reverend Everett Kelly, Herman Millender, Thomas Floyd, Chad Barclay, and Greg McNath. *Id.* "Shortly after" complaining on one occasion, Mr. Calhoun asserts that Reverend Kelly and Mr. Barclay informed Wood of Mr. Calhoun's complaints. Doc. 28-2 at 24-25. In fact, Mr. Calhoun testified

that a union representative talked to Mr. Wood on the same day as one of his complaints. *Id.* at 25. At some point afterward, Wood was forced to remove several AWOL entries he had made on Mr. Calhoun's record.

Secretary McHugh acknowledges that Wood had to change AWOL charges that he had made against Mr. Calhoun on May 21 and 22, 2008, after Mr. Calhoun complained to his union. Doc. 44 at 19. But, the Secretary otherwise denies – or denies the materiality of – all of the other claims Mr. Calhoun makes above. He emphasizes that Mr. McKinney, the Acting Tracked Systems Division Chief, eventually conducted an investigation and issued Mr. Wood a Letter of Warning. *Id.* The Secretary also protests that:

> Calhoun does not have personal knowledge of what [the] union did or with whom they discussed the alleged complaints of alleged sexual comments, other than referring him to Mr. McMath, the EEO officer. He only assumed the union did something with the alleged complaints because he pays union dues. Calhoun only went to see McMath once around September 4, 2004[19], which was about three months after he alleges he first complained to the union about the comments.

*Id.* (internal citation omitted). In conclusion, Secretary McHugh underscores that Mr. Calhoun "cannot show that the AWOL charges were motivated by anything other than [his] failure to follow established leave procedures." *Id.* at 32.

---

[19]The court assumes that this is a typographical error and that the Secretary meant to inscribe September 4, 2008, as the appropriate date – given that Mr. Calhoun was not employed at the Anniston Army Depot on September 4, 2004.

The court does not agree. In fact, Mr. Calhoun has shown that:

- he complained about (what he considered) unlawful employment practices at the Depot before being charged AWOL by Wood;

- Wood then charged him with AWOL on several occasions; and

- Wood was ultimately forced to remove many of these charges.

Mr. Calhoun has also identified genuine factual disputes over:

- when and to whom he complained in the spring and summer of 2008;

- what he precisely complained about on these occasions; and

- when Wood became aware of these complaints.

Altogether, a reasonable fact-finder could conclude that Secretary McHugh's offered reason for charging Mr. Calhoun AWOL merely acted as pretext for retaliating against him based on his protected opposition to allegedly illegal employment practices at the Depot. Moreover, charging an employee AWOL "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68.

### 3. *Nonrenewal*

For similar reasons, the court finds that Mr. Calhoun has rebutted the Secretary's nonretaliatory reasons for declining to renew Mr. Calhoun's employment term. On the one hand, the AWOLs that Mr. Calhoun accumulated in the spring and

summer of 2008 greatly contributed to his supervisors' decision not to renew him – a point Mr. Wood admitted in his deposition testimony. *See* Doc. 28-2 at 181 ("[T]he AWOLs is what got his job."). Other evidence further supports Mr. Calhoun's pretext arguments. Mr. Calhoun affirmed in his deposition testimony that the letter Mr. Funderburg drafted on or around July 16, 2008 – stating that Mr. Calhoun would not be renewed – came after Mr. Calhoun had complained to his union about his AWOLs and Mr. Wood's "sexually-charged" remarks. *Id.* at 179. Mr. Calhoun also asserted that Wood had vouched to Mr. Calhoun, after he complained to the EEOC, that Wood was the final arbiter of whether Mr. Calhoun's term would be extended. *Id.* at 180. Indeed, Mr. Funderburg admitted in his deposition testimony that he relied "solely" on Wood's documentation in deciding not to renew Mr. Calhoun's term. Doc. 28-3 at 13. Finally, Mr. Calhoun was the only employee in his building not extended at that time – a point which the Secretary does not deny. *Compare* Doc. 30 at 24 *with* Doc. 44 at 23.[20]

Further bolstering Mr. Calhoun's case are the discussed irregularities concerning Mr. Wood's records on Mr. Calhoun's attendance. As noted, Wood

---

[20]The Secretary instead maintains that the point is immaterial because "Calhoun cannot show disparate treatment from a similarly-situated comparator." Doc. 44 at 23. In the retaliation context, however, it is relevant to Mr. Calhoun's pretext argument that he – who had complained so frequently to his superiors and union representatives – was the only one not renewed.

admitted in his deposition testimony there were discrepancies in and among these records. Doc. 28-6 at 28. He further acknowledged that the records were not chronologically ordered and that this was because they did not represent the original copies. Doc. 28-2 at 146-47. Wood had in fact transferred the information to these records from his original notes, which he no longer possessed. *Id.* Relatedly, Wood did not remember the exact date he had changed the May 21 and 22, 2008, AWOLs to "leave without pay." Doc. 44 at 22.

In sum, Mr. Calhoun has identified sufficient weaknesses in Secretary McHugh's rationale for not renewing him that a reasonable fact-finder could find it "unworthy of credence." *Cooper*, 390 F.3d at 725. The prospect of nonrenewal is certainly one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."*Burlington Northern*, 548 U.S. at 68. With this conclusion in mind, a genuine material factual issues exist as to why Mr. Calhoun was not renewed, when that decision was made, who fundamentally made it, and for what reasons. Mr. Calhoun's retaliation claim will thus survive summary judgment.

## IV.  Secretary McHugh Has Shown that Mr. Calhoun Cannot Prove Actionable Sexual Harassment.

### A.    *Legal Framework*

Title VII of the Civil Rights Act prohibits an employer from discriminating

against a worker "with respect to [the worker's] compensation, terms, conditions, or privileges of employment, because of" the worker's membership in a protected category such as race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). This disparate treatment "can take the form of a 'tangible employment action,' such as a firing or demotion, or of a 'hostile work environment' that changes 'the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned.'" *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (quoting *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004)). To prove a hostile work environment, the plaintiff must show that:

- he or she belongs to a protected group;

- he or she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;

- the harassment was based on his or her sex;

- the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily-abusive working environment; and

- there is a basis for holding the employer liable for such conduct

*Id.* at 808 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)). "Workplace conduct is not measured in isolation." *Id.* (quoting *Clark County*

*Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (per curiam)). "Rather, the evidence of harassment is considered both cumulatively and in the totality of the circumstances." *Id.* (citing *Mendoza*, 195 F.3d at 1242).

"Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." *Mendoza*, 195 F.3d at 1246 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id.* (quotation omitted). "The environment must be one that 'a reasonable person would find hostile or abusive' and that 'the victim . . . subjectively perceive[s] . . . to be abusive." *Id.* (quotation omitted). Further, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris,* 510 U.S. at 23).

"The objective component of this analysis is somewhat fact intensive." *Mendoza*, 195 F.3d at 1246. In determining whether harassment objectively altered an employee's terms or conditions of employment, courts should consider four factors:

- the frequency of the conduct;

- the severity of the conduct;

- whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and

- whether the conduct unreasonably interferes with the employee's job performance.

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23). None of these factors is individually determinative. For instance, regarding the final factor, "harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002) (citing *Harris*, 510 U.S. at 22). Rather, "courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246 (citations omitted).

On a broader level, "not all objectionable conduct or language amounts to discrimination under Title VII." *Reeves*, 594 F.3d at 809. "Although gender-specific language that imposes a change in the terms and conditions of employment based on sex will violate Title VII, general vulgarity or references to sex that are indiscriminate

60

in nature will not, standing alone, generally be actionable." *Id.* Title VII is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale*, 523 U.S. at 80). "Title VII's test is instead whether 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Reeves*, 594 F.3d at 809 (quoting *Oncale*, 523 U.S. at 80).

### B. Mr. Calhoun has not made a prima facie case because he cannot show that Mr. Wood's comments altered his employment terms and conditions.

In his Complaint, Mr. Calhoun claims Mr. Wood subjected him to a hostile work environment during his time at the Anniston Army Depot. Doc. 1 ¶¶ 66-68. This was so because Mr. Calhoun "was forced to endure the humiliation and embarrassment  of [Mr.Wood's] sexually charged remarks and insults." *Id.* ¶ 68. These remarks and insults allegedly included the following:

- [After Calhoun's injury] "You cannot beat your dick now with your shoulder like that;"

- "The load your daddy discharged and conceived was a waste;"

- "If I was your momma, I would have slapped your daddy for climbing on top of her and cumming in her and having a sorry piece of shit like you;" and

- [Grabbing his genitals] "I've got it right here"

61

*Id.* ¶ 66. According to Mr. Calhoun, these occurred on a "regular basis" in the spring of 2008 after he injured himself. *Id.* ¶ 28.

In his motion for summary judgment, Secretary McHugh admits that Wood made "ignoble" comments to Mr. Calhoun during this time period. Doc. 27 at 23. However, the Secretary argues that Mr. Calhoun's sexual harassment claim still fails as a matter of law because he cannot show that (1) his gender motivated the comments and (2) the comments were sufficiently severe and pervasive to alter the terms and conditions of his employment. *Id.* at 24. The court disagrees with the first point but agrees with the second. Wood's comments were arguably gender-specific, and Mr. Calhoun reasonably vouched in his deposition testimony that he found the comments sexually humiliating. Doc. 28-2 at 105-07. This is sufficient to satisfy Mr. Calhoun's prima facie case on this point.[21]

Mr. Calhoun does not provide persuasive evidence, however, that Wood's comments were so severe and pervasive so as to objectively alter the terms and conditions of his employment. In his response to the Secretary's motion, Mr. Calhoun makes his case on this issue in the following manner:

> Clearly, Calhoun has established an environment was hostile by both the
> subjective and objective tests. The statements that were made were numerous

---

[21]A plaintiff may maintain a sexual harassment claim against someone of the same sex. *Oncale*, 523 U.S. at 79.

and continuous. They were severe, offensive, humiliating and they were made in front of the entire shop of co-workers. Essentially, Woods [sic] told Calhoun that his entire existence was a waste. On one of the occasions, Calhoun testified he walked away and employees approached him telling him they felt it was offensive. A reasonable person and Calhoun both could have found these statements offensive, abusive and way over-the-top. Even Funderburg, the Division Chief, who does not work in the shop, said he heard about the statements. In addition to statements, Woods [sic] was fabricating records, writing Calhoun up based on these fabrications, and conspiring with O'Conner trying to create a reason to not renew Calhoun which Funderburg admitted was all based on Calhoun's repeated complaints of racial discrimination.

Doc. 30 at 40.

This statement is largely conclusory and unconvincing. Mr. Calhoun asserts – rather than argues with citation to supporting authority– that Wood's comments were frequent, severe, and humiliating. Even were the court to credit Mr. Calhoun's assertion as objectively reasonable, he makes *no* effort to present *any* evidence that the comments were physically threatening –  rather than just unkind and offensive. *See Harris*, 510 U.S. at 21 (finding that the "mere utterance of an epithet which engenders offensive feelings in an employee" does not sufficiently affect the conditions of employment to implicate Title VII) (internal quotation marks, alterations, and citation omitted). Nor does Mr. Calhoun try to prove that the comments substantively interfered with his work responsibilities and performance. He certainly doesn't show that he was "exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed."

*Reeves*, 594 F.3d at 809 (citing *Oncale*, 523 U.S. at 80). Considering the entire context in which they were allegedly made, the court finds that the statements were not sufficiently "severe and pervasive to alter the conditions of [Mr. Calhoun's] employment." *Harris*, 510 U.S. at 21 (citation omitted). The court will thus grant Secretary McHugh summary judgment on Mr. Calhoun's sexual harassment claim.[22]

## CONCLUSION

For these reasons, the court will:

- **DENY** Secretary McHugh summary judgment on Count I of Mr. Calhoun's Complaint ("Race Discrimination – Disparate Treatment");

- **DENY** Secretary McHugh summary judgment on Count II of Mr. Calhoun's Complaint ("Discriminatory Discharge");

- **DENY** Secretary McHugh summary judgment on Count III of Mr. Calhoun's Complaint ("Retaliation"); and

- **GRANT** Secretary McHugh summary judgment on Count V of Mr. Calhoun's Complaint ("Sexual Harassment - Hostile Work Environment").

_____

[22]Because the court finds that Mr. Calhoun has failed to make his prima facie case here, it need not – and will not – address Secretary McHugh's arguments regarding administrative exhaustion, *see* doc. 27 at 10-13, or his invocation of the "Faragher/Ellerth defense," *see id.* at 24-25.

**DONE** and **ORDERED** this the 4th day of March, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge